I'll call the last case for today, St. Louis Condominium Association v. Rockhill Insurance Company. Good morning. Good morning. I'm going to try to keep my mask on, but if at any point it becomes a problem, I'll take it off. I just prefer to keep it on for personal reasons. Good morning, Your Honor. Maritza Pena for Rockhill Insurance. I'm with the firm of Marlo Adler. I'd like to start off with a little brief explanation of the case. This is a first-party insurance coverage dispute. Our client issued a commercial policy for a high-rise on Brickell Key. The high-rise is St. Louis Condominium Association. The lawsuit was filed as a result of claim damages stemming from Hurricane Irma. The hurricane happened in September of 2017. The first notice of loss came into the carrier on September 13. Within a week, the carrier had someone there inspecting the building along with a representative from the association. Counsel, because we have such a short time together, and I want to make sure that I focus on the issues that you all well raise in your briefs, I just want to fast forward a little bit. I know we're all familiar with the facts of what happened here. My first question is more just a clarification question. As I understand it, among the orders that you were appealing, you were appealing the motion for directed verdict or judgment as a matter of law after trial, correct? Correct. Okay. You were not appealing, as I understand it, because it's not been argued specifically, any of the Daubert motions regarding the experts. I know you're appealing the motion to strike the one expert. We'll talk about that. But in terms of the Daubert decisions, you were not appealing those, correct? Well, we are in a sense, because our second ground of appeal is based on the fact that there was inadequate data, insufficient data. So I guess that's my question. That seems an odd way to do it, and maybe it's okay, and you can tell me that it's okay. But as I understand the standard of review on a judgment as a matter, an appeal of a judgment as a matter of law, we take all the evidence viewed in the light most favorable to the non-moving party as true. And that would include all the expert testimony. Correct. And we do all inferences there. And if we're just looking at that standard, it would seem to me that we have to take as had been permitted through the gateway of Daubert, and the trial court did its Daubert analysis and allowed this testimony in, and we have to consider that as part of the judgment as a matter of law determination of whether the evidence was sufficient on the contract claim. Absolutely. That's 100% correct. Okay. So if we agree on that, then what do I do with all of this expert testimony that they these damages actually happen as a result of IRMA, the causation analysis, and the damage analysis that caused this much damage? Well, I gather that that's the dispute. I mean, the district court as the gatekeeper can only admit expert testimony that is reliable and relevant, and we believe mistakes were made because the testimony on its face is not reliable or relevant. And part of what I'm going to be arguing with regards to expert Warner is that even if you take St. Louis' experts and you review everything that they provided, it's clear that the damages posited to the jury were for repair of lack of maintenance and wear and tear. So it can't support the argument that these would be damages covered under our insurance policy, which can't cover those. Let's assume for the moment that this is a Daubert challenge, and again, I'm very confused about that because a Daubert challenge is we review that for abuse of discretion, and we give a lot of deference there. I imagine that's why you framed it this way and not as a Daubert challenge, but we'll save that for another day. What more reliable methodology would you want an expert to use other than I went to the building, I looked at the prior documents regarding the building, in other words, the history of the building up to it, I went there and inspected the damage itself, I looked at pictures of what it looked like before, I now look at pictures of what it looked like afterwards, I did an aerial view over the whole thing. I spoke to the both the manager of the building who is most familiar with it. I spoke to members of the board, I spoke to what more do you methodology do you want an engineer to do to determine what the cause of a particular damage to a building was? Well, if you look at the case law that we cited in the brief, they have an independent duty to independently investigate the building. And that didn't happen here. They took the self serving testimony of the property manager and the unit owner saying, yeah, it was all having to do with Hurricane Irma. I've read all the Daubert stuff. It seemed to me that some of these guys looked at 40 or 50 units. I think one testified that he looked at half the units in the entire apartment building. I mean, that doesn't seem like I just took their word for it, that it was this way before and this way afterwards. One guy lived across the street, right? And so he knew he actually had visual inspection of what the building looked like before and afterwards. That doesn't seem like I just took their word for it, does it? It does, if you read if you read their testimony and you read their reports, because if you read it, it's clear that what they're they're arguing about is a lack of maintenance and wear and tear. It's not a damage. And I guess that's the confusion, Your Honor. You know, the issues that we take with the ruling that the court made is that even if you accept everything that the experts say, it's true. It's not a covered damage under our policy. And that's the concern. The Daubert motions, we believe, were incorrectly ruled upon that. They said that there wasn't leaks before the wind damage. And now that there are leaks as a result of it, I mean, isn't isn't that a call? And it was done and it was caused by the fact that one hundred and eighty mile per hour gusts or one fifty mile per hour gusts were coming directly at the building. But that's not what it says. If you look at the Tories report, for example, they're calling for 16 million. Here's a bit of the issue, though, because the report isn't what's there. It's the testimony of the of the experts. That's why this isn't a Daubert issue. This is a they've testified. So we're going with their testimony and their testimony is that this happened. Right. Well, let's go with his testimony. So his testimony is that one hundred percent of the sliding glass doors and one hundred percent of the windows were damaged because of Hurricane Irma and need to be replaced. His testimony also is that the gaskets, for example, in the windows were were were leaking. That's not a hurricane issue. That's a wear and tear lack of maintenance issue. Do you have this inconsistency with the testimony? He says it is, though. He says it wasn't leaking before. And as a result of this, the gaskets failed. I mean, I know the other experts come and say it's wear or tear. I know you're telling me that. But we we have testimony from from someone who did a visual inspection, who has a career in doing this, who looked at these, they literally looked at them themselves and is saying that that was a result. The rain came in as a result of Irma, not because of of wear and tear that it happened. I respectfully, your honor, disagree. If you read the totality of his testimony, he's not saying that it's one hundred percent because of Hurricane Irma. And I think that's the discrepancy. I'd like to, at the time that I have remaining, concentrate on a big issue that we have on appeal for us, which is the court striking Brian Warner, who was the principal sliding glass door and window expert for the insurance company. That expert was stricken because he was not made available for deposition prior to the December 14, 2018 deadline. He was offered for December 13. And unfortunately, that deposition date did not work because a plaintiff's expert was going to testify that day. He was then offered the first week of January. And obviously, after the deadline, the special magistrate recommended that he be stricken, which we believe was a severe sanction. And against the case law, there was no bad faith. His report had been prepared in November of prior to the deadline after a two day inspection of the building on October 29th and October 30th. The other side had the full gamut of his opinions a month prior to the deadline. And the issue was a scheduling issue that was not created 100 percent by the insurance company. It was also the attorney simply couldn't agree on a date. What's what's concerning about it, Your Honor, is that there were two other experts that were allowed to testify. Those two are your experts. And they also, you know, dates were offered for them before the discovery cut off. It seems like those are kind of a different situation. Well, the dates were offered before and there couldn't there couldn't be an agreement on depositions, but they were allowed to testify in March, 90 days after the deadline. So the sanction of I mean, it seems like maybe you were fortunate that they were allowed to testify as opposed to being unfortunate that Mr. Warner was not. I can I can understand your your honor's reasoning, however, it seems that there was a different test applied to the three different experts. It was a reason for that, though. And the reason was that unlike with regard to Mr. Warner, where there was a bait and switch about the dates and he said he is not to depose those other people. Right. There wasn't a determination that they couldn't have been there. Was where's did the plaintiff request to depose those two other folks? Yes. And they actually moved to strike those two other experts as well for the same reasons. And those weren't stricken. Right. But there was no there was no back. And the district court specifically identified this issue. There was no back and forth and specific determinations that he was not they were not available during that time. Right. Well, no, one of the experts was having surgery, is my understanding. And that was the concern as well. I'm sorry, your honor, if I misunderstood your question. No. So why would it be an abuse of discretion here? Well, striking expert testimonies is is an extreme sanction, your honor. And this wasn't just any expert. This was the expert that was contesting the association's claims that 100 percent of the sliding glass doors and windows needed to be replaced. Right. This testimony was crucial to. And I understand that and I don't I understand completely why it was an important testimony. But here's my concern about this. I mean, if you agree that the district court could have stricken all three experts because none of them were timely deposed, then how was it an abuse of discretion for the district court to dismiss one or exclude one of the three? Well, I don't necessarily agree that the district court should have stricken any of the experts, all of the expert opinions. I mean, the issue is surprise prejudice to the other side. All of the expert opinions were produced in the report and they were provided to the other side. The issue was a scheduling one with in terms of having depositions where those opinions could then be fleshed out and attempts were made to comply with the deadline. And unfortunately, you know, the best that they could do with regards to Mr. Warner was offer him the first week of January. I mean, you're talking about the deadline was December 14. He was being offered the first week of January and you had the holidays and everything else in between. So there was no attempt. There was no bad faith, no willful delay, no flagrant disregard of the court's orders. They were trying to comply with the order. That's not required by the rule, though, right? The rule striking experts does not require. No, but it is required by the OFS case, which we cited, which is an 11th Circuit 2008 case. And those were the three factors that the court looked at. The rule doesn't require any sort of unlike for discovery violations, it doesn't require any sort of bad faith or intentional. No, the rule. The rule gives obviously deference to the district court and discretion. But this court, in interpreting that rule, looked to those three determinants. You know, was there bad faith? Was there a willful delay? Was was there a flagrant disregard, et cetera? And in that case, the court found that it was not proper to strike the expert. The other issue that we raised on appeal. I'm sorry. Let me just I mean, you're actually, I think, out of time. But if I could just address this one question and obviously it's up to Judge Martin as to the rest. But with respect to to Mr. Warner, I thought that although you offered him for deposition on December 13th and his earliest availability would not be until after the discovery deadline passed. So why doesn't that make him in a different boat than the other two? He was offered for December 13. That also turned out to be the same day that the plaintiff was going to have. But he was still unavailable for the 13th. Was he not? He was offered for December 13. Your your honor is correct. Then after the plaintiff's depots, the plaintiff's expert depot was set for the same day. That date was it's not clear from the record, but he he became unavailable. So they offered January 7th and we're talking about that. But I guess the point is, if he wasn't available for any day before the discovery period ended, why does that not make his case substantively different from the other two experts of yours who weren't deposed until after the discovery deadline, but who were available previously? Well, as noted in the record, your honor, and if you read the briefs, you'll you'll get the full timeline. The lawsuit was filed in March of twenty eighteen. We tried to get him in early on. And if you'll see, there was there was a dispute between the attorneys handling the underlying case as to how quickly he could go out and see the building. He ends up going October twenty ninth and October 30th for two full day depositions. He turns around, creates his opinions, drafts his opinions, produces that report on November 14. So you're talking about a very short window of time to make him available for deposition. So he couldn't have been produced. And I follow what your honor is asking. In August or September, he hadn't even gotten to the building and to perform his inspections. Those were done tail end of October. His report is created November 14. It's immediately produced. He's offered for December 13. And that's when we start having this dispute between the underlying counsel about scheduling. And that's why the deadline is missed. Miss, when you you've saved five minutes for, but only will give you that time. Thank you. Good morning. Good morning. And may it please the court. I'm Gray Proctor with Kramer Green, Zuckerman, Green and Buchsbaum. And with me at counsel table is Timothy Crutchfield from Mintz-Truppman, PA. For the cross appellant, the St. Louis Condominium Association, obviously we have a lot to cover, so I'm going to try as hard as I can not to rehash anything that's already in the briefs. I'd like to start with the issue of the deductible. Rock Hill cannot enforce the 3% deductible here under subsection 2 of 627.701 and the Chalfanti case because it bypassed the office of insurance regulation review process. Let me ask you a question. Even just assume for purposes of this question that we agree with you that there is a problem with what they did. I mean, is that enforceable? How does that, what is the penalty that is imposed on them under Florida case law? Because it seems to me like there isn't one. Well, your honor is correct. It would certainly be clearer if there was something explicit in the statute that said, if you violate this, it's not enforceable. However. But even beyond that, I mean, we have Florida case law that talks about similar types of violations where the court has said we can't create our own remedies for this. So as a practical matter, even assuming that there's a violation, what what is the practical effect? Thank you, Judge. The Chalfanti case is what controls whether it's enforceable. And Chalfanti sets forth a list of factors and it sets them forth with regard to the Roberts case. And the Roberts case is very important here. The counsel. I want to back up because you said there was no statutory framework or reference to what happens. It seems like Chalfanti specifically gave a statutory reference or at least read Florida law to give one. And that is that in section seven, I'm sorry, 627, 418, sub one, the legislature seems to suggest, and I'm quoting now, in that in the absence of an express penalty, which you agree there is here, courts should assume that a policy provision is valid despite noncompliance with the insurance code. It would seem that Florida law specifically allows that. And then I want to ask you a question about Roberts and then give you an opportunity to answer. With regard to Roberts, I've read Roberts and the first DCA seems to be clear that it's relying on the fact that the statute previously did have a penalty provision in the 1981 version. And only when it was amended, I think it was 82 or 83, 84, they looked at the legislative history and it said that it was only a clarifying amendment. And what the court there read it to say is since it was only clarifying, we are reading that penalty provision in. And that's what Chalfanti was relying on with regard to Roberts, that it wasn't silent. So if you could address those two things. Yes, thank you, Your Honor. First of all, section 627.418, that's Florida severability statute. And when you read the text of 627.418, it provides that if a policy endorsement or rider contains terms or conditions that aren't authorized by Florida law, the solution is not to strike the entire policy and it's not to strike the endorsement. It's to apply them with the language that would be in effect if the policy had complied with Florida. I don't know that I disagree with you in your reading. I just know what Judge Quinn said about that same exact provision. And she suggested that, and with the majority of the court, that the legislature seemed to suggest that in the absence of an express penalty, which is what we're talking about here, the court should assume that a policy provision is valid despite noncompliance. She read it to mean that it exists and it is there because there's no preventative provision, which tells us if you violate it, you need to void it or whatever. Well, Judge, with respect to what's going on in Chalfanti, she's absolutely right. Chalfanti deals with subsection 4, which again addresses the hurricane deductible. It requires that the face of the policy have a notice that's in a certain typeface using certain words. In Chalfanti itself, the problem was that the typeface was 10 percent too small and hurricane and windstorm had been transposed. All right. So that's a legal nullity. If we cross that off, we turn to the hurricane deductible itself. You have an endorsement that hasn't been altered. It's still operative. Everything is there to apply it as written because the problem is on the face of the policy. I'm not sure that's here. That's a that's a creative reading of Chalfanti. But that that doesn't seem to be what what the court is saying there. What the court is saying there, I think, is what Judge Rosenbaum asked, which is that if if because there's no valid there's no there's no provision telling us what to do if there's an invalidity or if there's a violation of that provision, we are to assume that it is valid unless the legislature provides us specifically with a remedy. And that that seems to be what Chalfanti is saying, and that in the the caps and the and the other portion to subsection 4, it didn't tell us what to do, unlike subsection 1, which does tell us what to do. And so you look at subsection 2 and it seems to be silent. I haven't seen any legislative history which says that a penalty provision existed there like it did in Roberts. How can I read this any differently than than the Florida Supreme Court read subsection 4 in Chalfanti? Well, Judge, there is a consequence. Unlike subsection 4, again, this is in Chalfanti, subsection 4 merely reads you have to do this. You have to include this in your policy. Subsection 1 and subsection 2, looking just at their text, both of these have consequences if you don't do what you're supposed to do. It's subsection 1 uses may not issue the policy unless subsection 2 uses may issue a policy only if. But there's a permission clause there. And that's different from merely saying that you have to do that. That's different than an invalidity provision, a penalty provision. In other words, that'd be different if it said unless you get permission, you may not issue an insurance policy. And if you issue it, that policy is void or that section of the policy is void. That seems to be the penalty provision, not not the direction on what an insurance company should and shouldn't do. It violated it here. Well, in the Chalfanti gives you the factors that you go through. We have the legislative intent here, Your Honor, in the legislative history, because, as you said, according to the Roberts case, once upon a time, there was a specific provision in subsection 1 and that goes away. And that's in the early 80s. And then in 1989, Roberts comes along and the courts say, yes, this is a penalty provision. And if you don't comply with subsection 1, you don't have your coinsurance provision anymore. The legislature in 1993 uses that exact same construction. Obviously, the wording is different, but you understand what I mean. Linguistically, it's the same. You don't have permission to do this unless you unless you go through the OIR review. So they use that same construction. Additionally, there was a presumption at the time in 1993 when subsection 2 was added. The earlier version of the statute, according to Chalfanti, says the statute provided that failure to comply with the statutory requirements would render the clause null and void. This is not the same as that. No, we have different indicia of legislative intent, and that's what's key here. I don't think you can read Chalfanti itself. Chalfanti says, unlike subsection 1, subsection 4 never included this enforcement provision. So obviously, there's no Senate report saying that it's merely a technical revision. But I think that's too narrow a reading. You have you're looking at other indicia of legislative intent as well to satisfy that factor of the Chalfanti test. We have the same text as subsection 1, just like Roberts. So that's the first Chalfanti factor. Two is legislative history. And, Judge, I think that's here because, number one, in 93, after Roberts had been decided, the legislature decided to use the exact same linguistic construction. Number two, there's a difference based on the Illingworth case. Illingworth stands for the proposition that if you need agency review to include something in a policy, you have to go get it or it's not enforceable. So based on that, we would expect the legislature to include some language exempting it from the Illingworth case. And we don't have that. We don't have that in the statute until we find subsection 3 that's passed later in 1995. And that's the first time in the statute that we see the language. This is the hurricane deductible provision. Insurers are required to offer a menu of options here. A failure to comply with this subsection shall be a violation of this code but shall not change the coverage. Why would that be necessary if the first two provisions didn't include a penalty if you didn't comply with them? So I think you have the same, obviously, not the removal of a provision that did create an express provision, but you have legislative history here that suggests that the legislature thought it wouldn't be enforceable. And that's the second Chalfante factor. The third is the impossibility of partial compliance. You either get OIR review or you don't. And then I, to return to... That's true of subsection 4. It either is or is not of a certain cap size. And it either includes the exact statement that's there or is not there. In other words, it's not an and or proposition. It's not, well, you can do this, but there's three words missing. I mean, the whole point of the warning is because the warning is important. But the Chalfante court did find that there was partial compliance. And I think it's distinguishable because it is a mandatory, I think the lower court, the district court in Chalfante went on this. They did find that it requires strict compliance, but still, there's a difference between something being completely absent and something being not quite perfect. And that doesn't translate to OIR review. You either submit it to the agency or you do not. You can't submit it to the agency in 10% too small of a typeface. So that just doesn't go together. I think 627.418, to return to that, when you apply that in this case, again, in Chalfante, you had the non-compliant notice provision. So you strike that, you go to the hurricane deductible, and you have a fully functioning hurricane endorsement that you can apply. You can save that provision. Here. The problem is the 3%. When you X that out, you can save the hurricane deductible, but you do it by applying the alternative minimum $25,000 deductible. And that's the deductible. 627.418, obviously the courts have looked at it. I don't think it can be read to say that if something violates the Florida insurance code, you apply it anyway. We interpret statutes consistent with how the Florida Supreme Court has told us to interpret those statutes, even if we might have read it a different way. And I just, I have a hard time reading that language that I've read to you now twice from Chalfante and coming to any different conclusion that they're saying that the legislature is telling us that if we don't give an express penalty provision, that you are to assume that the policy provision is valid. Well, and Your Honor, I would say that the legislature, I'm sorry, I would say the legislature, I mean the courts, they may put a certain gloss on it in a specific case, but the facts here are completely different. And it wouldn't be mere conjecture for the court to find that all of the Chalfante factors go against Rock Hill and for us. I think it's a straight-long application of Chalfante just ticking through the factors. And if I can, I'd like to address briefly our second argument regarding the sufficiency of the evidence. Rock Hill presented no evidence that $359,578 was the dollar amount of the pre-existing damages. But you did, didn't you? I mean, your expert had that figure in the, I mean, wasn't it Janine Pardee had that figure in her? It was Torres, but yes, Your Honor, it's in that invoice that's there in the brief. We presented that number, and so I think you've got the number in there. The question is, you never know what the jury's going to do with those numbers. So, well, well, yes, Your Honor, I understand. And there's a good reason that we treat them as a black box. But at some level, we still do review for the sufficiency of the evidence. Let me, and I apologize, please. There are two, let me just ask you about two pieces of evidence from expert Pardee, so the one that Judge Martin just referenced. On page 96 of her testimony, she seems to suggest that the concrete and stucco cracked because they were brittle. In other words, it was pre-existing. And so engineers planned places for those cracks to occur. So those cracks or joints could be caulked. In other words, they were pre-existing cracks that can be caulked. And then she testifies at page 105 that, quote, that the lack of waterproofing on the balcony was not the only cause of damage, but probably also allowed a lot of water intrusion that occurred during Hurricane Irma because the water was able to penetrate into the building envelope at the juncture with the building opening under the sliding glass doors and seep into the ceilings and walls of the units below. That's her testimony. So why is that not, why can't the jury from that conclude, looking at the TORRA's report, that caulking, there was already caulking problems that allowed it to go in. And we're using that caulking, the number that TORRA has said, for how much it would cost to caulk the building. TORRA's is very clear, and his estimate is as well, because the square footage matches up. TORRA's is very clear that he is talking about the caulking that goes around the perimeter of the sliding glass door and window assembly. But she just, page 105 of Party's testimony is what she specifically references, going under the sliding glass doors and then seeping into the ceiling and the walls of the unit. And when you look at the, I'm sorry, I'm sorry that his name escapes me, the other expert testifies that the water, well first of all, Is it TORRA's you're talking about? Not TORRA's, Your Honor, and I apologize. You're talking about Davis, Mr. Davis. I'm talking about Mr. Davis, thank you, Judge. Mr. Davis testifies that, well, so Party testifies that the waterproofing problem is the waterproofing on the balcony deck. That's not what TORRA's... I know that's what you guys argue in the brief, and she certainly talks about that. But I just read to you page 105 of her transcript, and it seems not just limited to that, but also to the caulking and the enveloping and the whatever the rubber stuff is underneath the sliding glass doors. So, Burt Davis makes it clear that the water is penetrating underneath the sill, and the sill is the base that the assembly rests on. The case wasn't litigated about caulking or anything else, and the reason for that is probably because of Brian Warner's testimony. This is docket entry 113-3 on page 5. Brian Warner, who obviously didn't get to testify, his opinion says that the perimeter sealant at the window openings typically look to be adequate and in good condition. And that's the sealant that Torres is talking about. Again, trial strategy is what it is, and this is not in the appendix, this is his report. May I ask you a record question? You know, somebody's going to have to write this opinion. Judge, it's a big one, so of course you may ask. Your argument about the Office of Insurance Regulation never signing off, you know, you all have this dispute. You say you raised it in the district court. Rock Hill says you didn't. Where did you raise it? It's raised in the post-trial motions. So, it is raised, and I don't have the docket entries for you, Your Honor, but there were a series of 50B and Rule 59 motions after trial, and that is where it was raised. Docket entry 270 and 272? Does that sound right? Judge, I'll take your word for it. I'm sure you're right. Okay. Thank you. Thank you. Your Honors, if I may address the applicability of 627.701, there is no penalty provision. Therefore, under Shelfante, Rock Hill agrees that in the absence of a direct penalty provision, the insurance deductible must be enforced as valid. We also take issue with, honestly, the applicability of 627.701 to this carrier who is a surplus lines carrier. As we argued in our brief, under Florida Statute 626.913, provisions of Chapter 627 do not apply to surplus lines insurance companies. Is there any evidence in the record that Rock Hill was a surplus lines carrier? No. And the reason there was no evidence in the record that Rock Hill was a surplus lines carrier is because until this brief, this issue had not been raised. The argument that... It was raised in the post-trial motions. I mean, there was a response to... What was raised in the post-trial motions, if you read the motions themselves, is the applicability of deductible, whether the deductible was clear or ambiguous, but the argument that the deductible form had not been shared with the Office of Insurance Regulation is raised on this appeal. And if it had... Obviously, we're not mind readers. If it had been raised, we would have made the surplus lines argument. But regardless, if you look at 627.701, that can apply to a surplus lines carrier. So under 626.913, it doesn't apply. And then under 626.924, surplus lines forms are not approved by any Florida regulatory agency. So it's a statute section that doesn't apply to us. With regards to the second argument, with regards to the pre-existing damages, it is the carrier's position that the determination of pre-existing damages was a function of a jury. I believe that that point is undisputed. And we may not know precisely why the jury ruled the way it did, but it heard the totality of the evidence and it decided that the pre-existing damages totaled $359,000 and change. And that should be upheld. It should not be reversed. And, Your Honors, unless you have any other questions for me, we will rest on our briefs. Thank you very much. We appreciate the presentation. We've got your case. We will be in recess until 9 o'clock tomorrow morning. Thank you. Thank you.